[Cite as *Stacy v. Gibson*, 2019-Ohio-2751.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| ROBERT STACY | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28204 |
| | : | |
| v. | : | Trial Court Case No. 2016-CV-5126 |
| | : | |
| PAUL J. GIBSON, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of July, 2019.

. . . . . . . . . . .

RICHARD L. CARR, JR., Atty. Reg. No. 0003180, 110 N. Main Street, Suite 1000, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

SCOTT G. OXLEY, Atty. Reg. No. 0039285, 325 N, Main Street, Suite 204, Springboro, Ohio 45066
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Gibson appeals from the trial court's October 17, 2018 order that $10,000 disbursed from Gibson's 401(k) plan and held in trust by attorney Scott Oxley be paid to Chris Cowan, the receiver for Ace Sprinkler, Inc. ("Ace"), for distribution as follows: $3,622.20 to Ace employee David Arvin, and the remainder to Gibson's former partner at Ace, Robert Stacy. We hereby affirm the judgment of the trial court.

{¶ 2} On October 5, 2016, Stacy filed a complaint against Paul Gibson and Ace. Stacy and Gibson were 50% shareholders of Ace. According to the complaint, Stacy, Gibson and Ace entered into a Close Corporation and Shareholders Agreement on May 11, 2006; the agreement contained "a deadlock provision" in Section 14, which Gibson invoked. Stacy alleged that, pursuant to the deadlock provision, Gibson offered to purchase Stacy's interest in Ace. The complaint alleged that "Gibson was to pay the entire debt of [Ace] with funds that he would be providing to [Ace]." Stacy alleged that, on March 31, 2016, "Gibson represented that his offer to purchase had become final." According to the complaint, Stacy, Gibson and Ace eventually entered into a more detailed agreement, effective July 15, 2016, to redeem Stacy's stock ("the redemption agreement"). Stacy alleged that, pursuant to the terms of the redemption agreement, "Gibson was to provide funding to pay off certain debts * * * and the purchase was to close on or before the 30th day after the date of the agreement"; the debts to be paid "included debts to be paid directly to Stacy and Stacy was to be paid his salary through the closing date." Stacy alleged that, although he had attempted to work with Gibson and Gibson's counsel, no closing had occurred and Gibson had not provided any "proof of funding." Stacy asserted a claim for breach of contract, arguing that Gibson had breached his contract to redeem Stacy's shares pursuant to the redemption agreement.

He also requested the appointment of a receiver for Ace.

{¶ 3} The shareholders agreement was attached to the complaint as Exhibit A. Section 14 provides:

**Deadlock**. (a) In the event the Shareholders are unable to agree on a Major Decision * * * or become deadlocked on any other issue material to the business of the Corporation (a "Deadlock") which, in any Shareholder's opinion, is essential for the successful operation or prudent conduct of the Corporation's business, then the provisions of Section 14.(b) [sic] shall apply and any of the Shareholders ("the Electing Shareholder") shall be permitted to pursue the rights provided in Section 14(b).

(b)   In the event of a Deadlock, including the failure to agree on a Major Decision, the Electing Shareholder shall have the right to deliver to the other Shareholders a written demand that the requested action be taken or transaction approved.   If such other Shareholders do not, within 15 days following the delivery of such demand, respond affirmatively to the demand, then the electing Shareholder shall have the right to pursue the compulsory buy-sell provisions contained in Section 14(c).

{¶ 4}  Stacy attached to his complaint a December 7, 2015 correspondence from Gibson to Stacy invoking the deadlock provision and identifying "[i]ssues needing to be recognized and corrected by Robert Stacy" (Exhibit B), and a January 29, 2016 correspondence from Gibson to Stacy (Exhibit C).  Exhibit C was captioned "Second notice as per Section 14" of the shareholders agreement. It stated:

As per our agreement this written offer is to both sell my shares or to

purchase your shares.

At this juncture you chose [sic] which position you choose – Buyer or Seller.

You have a total of 45 days from date of second notice presented to you to choose.

If at the end of the 45 days you have not made a decision then it is deemed that you are to sell.

Currently the long term debt, accounts payable and monthly revolving payments such as vehicles total $805,657.00.

Buyer assumes all debts.

Buyer offers the following:

● Within 45 days of acceptance of this offer, the entire debt of Ace Sprinkler will be paid in full.

● Funds necessary to remove all debt from Ace Sprinkler Inc. will be afforded by buyer.

● The payment made by buyer will be in the form of a cashier's check to Ace Sprinkler Inc., and Ace Sprinkler Inc. will disperse said funds to satisfy all debt holders.

● Upon acceptance of this offer, seller will assign his 50% ownership of Ace Sprinkler Inc. over to buyer.

{¶ 5} Two additional items were attached to the complaint as Exhibits D and E. Exhibit D was a March 31, 2016 "Finalization of Buy-Sell Agreement" signed by Gibson. Exhibit E was the July 15, 2016 redemption agreement signed by Gibson and Stacy; it provided in part that, pursuant to the notices sent by Gibson, Stacy had "elected to accept

the offer to sell all of his shares in the Corporation," and that "the purchase price for such shares is that Mr. Gibson shall pay or shall cause the Corporation to pay all existing debts of the Corporation."

{¶ 6} On October 12, 2016, Stacy filed an amended complaint which asserted claims for breach of contract, breach of fiduciary duties, bank fraud, and "fraud after signing redemption agreement" and requested appointment of a corporate receiver. In addition to the exhibits described above, which were attached to the first complaint, Stacy attached Exhibits F and G. Exhibit F was an October 6, 2016 correspondence to Gibson from "John Callahan" requesting "return of monetary funds of $625,000.00 to Settlor." Exhibit G was a redacted PNC Bank statement in Gibson's name for the period of September 5, 2016 to October 6, 2016, reflecting a beginning balance of $150.05 and an ending balance of $625,150.05.

{¶ 7} On October 12, 2016, Stacy also filed a motion for a hearing regarding the appointment of a receiver. The motion sought "an expedited hearing" and asserted that Gibson had "engaged in an ongoing scheme of fraud," had "mismanaged" Ace, "making it insolvent," and had "failed to pay federal, state, and local taxes which are grossly past due." It further asserted that Gibson had improperly "taken over total control of Ace's financial assets, cutting of [Stacy's] ability to review any financial transactions."

{¶ 8} On October 19, 2016, the court issued a "scheduling order" which stated: "The hearing on the motion to appoint a receiver recessed. The hearing will resume on Friday, October 21, 2016 at 3:00 p.m. in the event that the agreement read into the record is not fulfilled." The record does not include any information about any agreement that was read into the record or the circumstances under which this occurred.

**{¶ 9}** On October 27, 2016, Stacy filed a motion to show cause, which stated that the parties had executed a settlement agreement on October 21, 2016, and Gibson had failed to comply with that agreement. Stacy asserted that, pursuant to that settlement agreement, Gibson was to provide proof that he had opened a new bank account for the purpose of receiving funds to fund the settlement, that Gibson had failed to provide such proof, and that no closing had been scheduled.

**{¶ 10}** On October 31, 2016, Stacy filed an agreed settlement entry, which stated that the parties had reached a settlement of their dispute and that all claims would be dismissed with prejudice. The agreed settlement entry provided that the court would retain jurisdiction for the purpose of enforcing the terms of the parties' agreement, that the agreed settlement entry would be treated as a court order, and that any violation of the agreed settlement entry would be "subject to contempt." The agreed settlement entry was signed by the judge.

**{¶ 11}** On November 21, 2016, Stacy filed a motion for a temporary restraining order, asking that Paul Gibson be "restrained from performing any financial transactions on behalf of Ace and be restrain[ed] from disposing of any of his personal assets or any of Ace's assets * * *." Stacy attached a subpoena issued by his counsel to Huntington National Bank in Brookville requesting balance and transaction information for an account number ending in 692, a check dated October 24, 2016 made out to Gibson for $625,000.00, and a Huntington Bank deposit slip for an account ending in 692, showing a beginning balance of zero and a deposit of $625,000. The court granted the motion.

**{¶ 12}** After a hearing on November 14 and 18, 2016, the court appointed John Paul Rieser as the receiver for Ace.

{¶ 13} On December 15, 2016, the trial court found Gibson in contempt of court. The court's entry stated:

This matter came on for a hearing on Plaintiff Robert Stacy's Motion to Show Cause as to Contempt on November 14, November 18, and December 9, 2016. On the basis of the earlier two hearings, this Court entered an Order Appointing Receiver for Ace Sprinkler, Inc. on November 21, 2016. Defendant, Paul J. Gibson, was not present at that hearing and as a result, this court continued the hearing until December 9, 2016 in order to give Paul J. Gibson an additional attempt to appear and show cause as to why he should not be held in contempt.

On December 9, 2016, Paul J. Gibson did appear in court, fired his attorney, David Duwel, and those [sic] chose not to participate in the hearing. As explained to Mr. Gibson in court, the hearing would go forward without his participation.

On the basis of the hearings held on November 14, November 18, and December 9, 2016, this Court finds that Paul J. Gibson has acted in contempt of this court through fraudulent testimony and the offering of fraudulent documents as part of the settlement agreement ordered by this Court. As sanctions against Paul J. Gibson for his fraud, this Court awards a judgment in favor of Plaintiff, Robert Stacy, and against Defendant, Paul J. Gibson, in the amount of $13,396.69. This amount was determined by the attorneys' fees and costs incurred by Plaintiff, Robert Stacy, in bringing this contempt to the Court once Robert Stacy's Amended Complaint was

filed on October 12, 2016. This judgment is not in lieu of whatever other civil remedies Plaintiff, Robert Stacy, may have for breach of contract and is not in lieu of any other and further sanctions which this Court may award due to Gibson's contempt of this court as an institution. This Court has not yet decided if additional fines or sanctions will be imposed upon Paul J. Gibson.

* * *

{¶ 14} On April 21, 2017, the receiver filed a motion to resign and to freeze the receivership escrow bank account at Huntington Bank pending further order of the court. On April 27, 2017, the trial court, with the agreement of the parties, granted the motion to terminate Rieser's role as receiver effective May 2, 2017. On May 3, 2017, the court appointed Chris Cowan as receiver.

{¶ 15} On June 21, 2018, Stacy filed a "motion to detain funds." The motion provided:

Pursuant to the attached documentation, the Receiver appointed by this Court, John Rieser, consented to the release of 401(k) funds to Paul Gibson on the condition that $10,000 be maintained in Scott Oxley's trust account pending resolution of claims regarding Gibson's misappropriation of money that should have gone into persons' 401(k) accounts. * * *

Scott Oxley has now threatened to release the $10,000 set aside for these claims. Robert Stacy and David Arvin are entitled to those funds on the basis that Paul Gibson defrauded them by not depositing the 401(k) and Gibson taking funds for himself, while not paying 401(k) funds for Stacy and

Arvin, creating a misappropriation of corporate funds which were held in trust for 401(k) purposes.

The undersigned respectfully requests that a hearing be set regarding the disposition of the $10,000 held by Scott Oxley and that the funds be retained by Oxley in his trust account pending that hearing.

{¶ 16} Exhibit A was attached to the motion, and the first page of the exhibit was a March 22, 2017 email from Rieser to several others, including Oxley. The email stated in part:

2. [Gibson] has not agreed to fund the other two participants['] pre Receivership deficiencies, but he has agreed to receive out of his distribution a separate check in the amount of $10k to be signed over to me and to be held in a separate escrow account by me as Receiver that is sufficient to fund these amounts, but preserving his right to research the issue and possibly agree or submit the question to the court handling the Ace case.

* * *

5. I am holding in escrow all amounts due for [Gibson] and the other participants post 12/1/16 to the present and will get a list to Terri so these can be remitted and credited separately.

{¶ 17} Also attached to the motion was an April 17, 2017 email to Stacy from Carol M. Bigornia at "jhancock.com," which provided in part:

I'm hoping you would reply to this email to approve the withdrawal of Paul Gibson's 401k account, following the payment instructions as stated in

the receiver, John Rieser's attached letter. Here's a screen shot taken from the letter:

I authorize you to release Paul Gibson's 401(k) funds, subject to the following terms:

1.) The funds must be paid to Attorney Scott Oxley's account, not to Mr. Gibson directly. Mr. Oxley and I have an understanding that part of the funds will be held in escrow, subject to the terms of the attached email dated March 22, 22017.

{¶ 18} Finally, an April 10, 2017 email from Sarah White at "riesermarx.com" to Bigornia was attached, which provided in part: "We are sending a check to John Hancock by overnight delivery for the post-December 2016 contributions."

{¶ 19} On July 3, 2018, the court granted Stacy's motion to detain funds and scheduled a hearing "on 401(k) Funds" for September 28, 2018.

{¶ 20} On September 14, 2018, the court set a hearing for October 26, 2018 to "approve sale."

{¶ 21} At the September 28, 2018 hearing, Oxley acknowledged that the $10,000 at issue was being held in his trust account. Counsel for Stacy presented Exhibit A, which he described to the court as "a series of emails that established the escrow of * * * those funds." Exhibit A was admitted by stipulation.

{¶ 22} Counsel for Stacy then called receiver Chris Cowan to testify. Cowan, an attorney and licensed CPA, stated that he had control of or access to Ace's records. Cowan identified July 2017 correspondence between Oxley and him, which provided his analysis of the activities that were at issue here with respect to the 401(k). Cowan

testified that it was "a little complicated" because two individuals – Stacy and Arvin – were affected by this account. Cowan testified that there were "a couple of different calculations in the 401(k). There's some loan amounts; there's some withdrawals that are for the benefit of the employee; and we also have a (indiscernible) of matching that the employer, Ace, is supposed to be doing." Cowan testified that Arvin was "a claimant in the receivership."

{¶ 23} Cowan testified that he had "supporting schedules" for what he believed were "the amounts * * * applicable to each one of the individuals for each of the classifications." Cowan testified that his Exhibit A showed when the last payment in the amount of $4,900.00 was made to the 401(k) administrator, John Hancock, for a period ending May 9, 2016; Cowan called this a "mark in the sand" for when the plan was still being funded." Cowan testified that his Exhibits B and C were the supporting schedules showing the amounts that were not put into the plan for Arvin and for Stacy."

{¶ 24} The following exchange occurred with Stacy's attorney:

Q. Could you walk us through the amounts stated on page 1 of Exhibit B?

[COWAN]. I can. For Mr. Arvin, it starts at the bottom and you'll see on page 2 there is a withholding payroll amount that is supported by Exhibit B for Mr. Arvin and it shows that there was a withholding out of his paycheck of 1690 bucks. And you can tick back into the accounting records here and you'll see Exhibit B and it shows, in the column on the far right, that for many weeks - - I guess its approximately 26 – that 65 bucks a week * * * was taken out of his paycheck, a total amount of 1690 that was

not remitted to the plan.

* * *

Q. And you said those were the amounts for Mr. Arvin. Were there similar amounts for Mr. Stacy?

A. Yes. You need to go to another schedule for Mr. Stacy. Mr. Stacy has - - that would be Exhibit C - - and his amount each month for Mr. Stacy was 144 bucks - - pardon me, a week - - 144 bucks a week and you'll see we have a number of weeks where withdrawals were taken out of his paycheck and those monies were not remitted to the plan administrator for a total of $2,880.

Q. * * * What are the other amounts for the other factors that you described to us earlier?

A. Both Arvin and Stacy had loans that would be repaid and amounts were taken out of paychecks for that transaction. And for Mr. Arvin, you have to go back to Exhibit B which would be like the second page of that exhibit. His weekly amount was $19.34 and it was a series of weeks that this was withdrawn, totals to $580.20. And for Mr. Stacy, you're going to have to work back to Exhibit C to find the Stacy loan payments and they are 2306.60 for Mr. Stacy. So that would be the withdrawals for both of them for 401, if you will, out of their paycheck, the loans for each of them. And then there was also a company matching piece that scheduled out for Mr. Arvin. It would be back on page - - * * * Schedule B; that'd be $1,352. For Mr. Arvin and on Schedule C, you'll see 2606.60 [sic] as a loan for Mr.

Stacy.

Q.   Were there also employer matches?

A.   That would be the employer match.

Q.   That's the employer match.

A.   The 2306.60 - -

* * *

A. – for Mr. Stacy would be the employer match.   And the employer match for Mr. Arvin would've been the * * * the 1352.   So three components for two gentlemen.

Q.   Do you know who was in charge of payroll at the time these amounts were deducted from Mr. Arvin and Mr. Stacy?

A.   It's my understanding that Mr. Gibson was the person in charge of this.

Q.   Have you formed an opinion as to the amounts that should have been paid into the 401(k)?

A.   Yes.   * * * I have them all summarized here.   * * * If you go back to Schedule D, you'll see there's a schedule for Mr. Stacy.   His total amount of the three classifications is $7,106.60 and for Mr. Arvin, $3,622.20 that's part of that exhibit.

Q.   And at some point, did you propose how the $10,000 should be divided?

A.   We actually have a little more liability than money.   And so I had talked to Mr. Stacy and I suggested to him that we cash out Mr. Arvin.

There's not a huge differential. * * * It's like 6 or $700. * * * Mr. Stacy was willing to take a little haircut on this to get Arvin paid out and that would be my recommendation that he get paid in full and that Mr. Stacy take a little differential just to get Arvin out of the picture.

* * *

A. * * * It would be $3,622.20 for Arvin and 6300 and change for Mr. Stacy.

[STACY'S ATTORNEY]: And, Your Honor, it is still Mr. Stacy's position to allow payment to Mr. Arvin ahead of his claim.

* * *

Q. Mr. Cowan, do you have an opinion as to whether or not the monies escrowed should be paid for the purposes indicated in your letter?

* * *

THE WITNESS: I have an opinion, yes. I see no reason in law or equity or any other reasons why an innocent person like Mr. Arvin, who's just an employee working as a pipefitter for Ace and Mr. Stacy, who was, my understanding, was nowhere on the premises and had no involvement in any of these transactions, why either of those folks should have an economic loss by the unfunding of their 401(k) when apparently these monies were diverted to other purposes in the company, so. I have no reason why they should not receive their funds. * * *

{¶ 25} On cross-examination, Cowan stated that the May 9, 2016 final payment was to fully fund the plan up February 25, 2016. He testified he had not looked at the

documents that implemented the plan, but that he "assum[ed] it's a current valid pension plan." He testified that John Hancock administered the plan and Huntington Bank held the funds. When asked if Ace funded Gibson's 401(k) plan from February through December 2016, he responded, "my understanding [is] his plan wasn't funded. I don't have those records but looking at Rieser's notes, my understanding [is] there was a deficiency in his 401(k)." Cowan also testified that Gibson "had a loan and some other things that were interrelated that were netted out when * * * his amount in the plan was made available to him." Cowan testified that "[t]hey washed out," and if Gibson "had money that wasn't paid in, it was part of the side deal that Rieser had that he was going to take this loan and walk. It was just this 10,000 to my understanding that we have at issue." When asked if he had an opinion as to whether Gibson's funds were "exempted" under R.C. 2329.66, Cowan stated that he did not have an opinion on the issue.

{¶ 26} On redirect, Cowan stated that the plan became current once the May 9, 2016 payment was made. He identified his Exhibit C as a claim that Stacy had "filed in the receivership for various items;" page 2 included a claim for a loss in a 401(k).

{¶ 27} Gibson testified on cross-examination that he was "a 50 percent owner" of Ace prior to the receivership; Gibson and Stacy initially controlled the company checkbook, but Gibson took Stacy off the account as an authorized signor in July 2016 without obtaining Stacy's signature. The following exchange occurred with Stacy's attorney:

> Q. Were you in charge of payroll - - let's just focus on the time between July 2016 and the start of the receivership. During that time, were you solely in charge of the finances?

A. Yes.

Q. And during that time, were deductions taken from payroll?

A. Yes.

Q. Did those deductions include 401(k) payments?

A. Yes.

Q. After July of 2016, were any 401(k) payments made?

A. To the best of my knowledge, no.

Q. During that time, did you continue to draw a paycheck?

A. Yes.

Q. What happened to the money that was withheld from those paychecks, the paychecks of your employees?

A. One more time, sir.

Q. After July of 2016 - -

A. Yes, sir.

Q. - - After July of 2016 - -

A. Yes, sir.

Q. - - there was money withheld from paychecks - -

A. Yes, sir.

Q. - - of employees, correct?

A. Yes, sir.

Q. And some of that money was for 401(k) purposes, correct?

A. Yes, sir.

Q. That money, once it was taken out, was kept in the company,

correct?

A. Yes.

Q. And you, in charge of the finances, you took some of that money for yourself, didn't you?

A. Explain that.

Q. Did you continue to draw your own paycheck?

A. Yes, sir.

Q. Did you continue to write other checks to yourself such as reimbursement of expenses?

A. Yes, sir.

{¶ 28} On direct examination, Gibson testified that between July 2016 and December 2016, Ace had one bank account from which operational expenses and payroll were paid, and that during that time, Ace did not fund any employees' 401(k) plans, including his own.

{¶ 29} At the conclusion of the hearing, counsel for Stacy asserted that the funds in defense counsel Oxley's trust account were set aside to pay Stacy and Arvin, and "with that consent and with that agreement we would argue that the exemption [in R.C. 2329.66] does not apply." Counsel for Gibson asserted that there had been "absolutely no agreement to set aside $10,000" to fund Arvin's and Stacy's 401(k)s, and that "Ohio law is very clear that 401(k) money from a qualified plan is exempt from attachment from any debtor" pursuant to R.C. 2329.66(A)(10)(c). The court took the matter under advisement.

{¶ 30} On October 10, 2018, receiver Cowan filed a notice to "all Claimants,

Creditors and Parties in Interest of Ace Sprinkler," to which he attached the contract to purchase Ace.

{¶ 31} On October 17, 2018, the trial court issued an order regarding distribution of the funds held in escrow relating to 401(k) payments. The court made the following findings of fact and legal conclusions:

Paul Gibson holds a fifty percent ownership interest in Ace Sprinkler. He was solely responsible for the operation and financial transactions of the company from July 2016 until the date of the receivership. After July 2016, Gibson, Stacy and Arvin had funds withheld from their compensation dedicated to be contributions to their 401(k) plans. Such funds, however, were not deposited into the 401(k) plan for Stacy and Arvin, although Gibson continued to pay himself his salary and business reimbursements. Ultimately, Gibson withdrew $10,000 from his 401(k) account. That sum has been held in trust pending the resolution of various payment issues. The sum withheld from Arvin's compensation for his 401(k) contribution totaled $3,622.60. The sum withheld from Stacy's compensation for his unpaid 401(k) contribution totaled $7[,]106.60. Gibson argues that, since the source of the $10,000 held in trust was his 401(k) plan, such funds are immune from collection. Stacy argues that Arvin should be compensated in full from the funds held in trust, with the remainder to be paid to Stacy.

* * *

R.C. 2329.66 states that every person who is domiciled in Ohio may hold certain property exempt from execution, garnishment, attachment, or

sale to justify a judgment order. Included in the list of property exempt from execution, garnishment, attachment, or sale are retirement benefits, including pensions, benefits, annuity, retirement allowance, etc. *R.C. 2329.66 (A)(10)(a)*. 401(k) plans fall within this category.

While the funds are protected under most circumstances, they must be in a retirement account to enjoy that protection. In *Yoppolo vs. Fifth Third Bank (In re Bostic)*, a debtor withdrew money from her protected account to pay a debt. The Court held that "[t]here was not statutory support protecting the funds from the debtor's creditors once she withdrew the money from her protected plan and deposited it into her personal checking account." *Yoppolo v. Fifth Third Bank (In re Bostic)*, 171 B.R. 270 (Bankr. N.D.Ohio 1994). Similarly, in *Casarow v. Chomenko (In re Cobb)*, the Court held that money withdrawn from an ERISA account and deposited into a checking account did not qualify for protections. *Casarow v. Chomenko (In re Cobb)*, 231 B.R. 236 (Bankr.D.N.J.1999).

Finally, in *In re Ahmed*, the Court reasoned that "[i]f a retiree withdraws money he saved for retirement and uses it to buy a car, the dealer does not then hold 'retirement funds.' Money set apart for retirement cannot remain 'retirement money' forever." *In re Ahmed*, E.D.Mich. No. 11-15279, 2012 U.S. Dist. LEXIS 146722, 110 A.F.T.R.2d (RIA) 6272 (Sep. 29, 2012). The caselaw stands for the proposition that the funds protected by R.C. 2329.66 are only protected while held in those accounts.

Hence, the funds [held in defense counsel's trust account] are no

longer protected by R.C. 2329.66, as they no longer reside in a protected 401(k) account. Gibson's sole financial control over Ace from July 2016 until the receivership allowed the funds withheld for contribution to the 401(k) plans of Stacy and Arvin to be re-directed, wasted, or used for Gibson's sole benefit. Under these circumstances, the expectations of the innocent parties should be protected. Whether analyzed under the doctrines of quantum meruit or unjust enrichment, the funds should be distributed as previously indicated.

{¶ 32} The court ordered that the $10,000 held in trust by attorney Oxley be paid to the receiver for distribution in the amount of $3,622.20 to Arvin, with the remainder to be paid to Stacy.

{¶ 33} On October 26, 2018, the court approved a "Contract to Purchase" dated October 5, 2018.

{¶ 34} Gibson appeals from the trial court's October 17, 2018 judgment. He raises one assignment of error:

THE TRIAL COURT ERRED BY RULING THAT APPELLANT'S 401K FUNDS COULD BE ATTACHED AND DISTRIBUTED TO CREDITORS.

{¶ 35} According to Gibson, on April 21, 2017, funds were disbursed from his 401K plan; by agreement of the parties and the receiver, $10,000 was held in trust by Gibson's attorney (Oxley), "awaiting further disbursement," and Gibson received the rest. Gibson, argues that there was no agreement by Gibson, individually, to fund Arvin's and Stacy's 401(k) plans for the period of May through December 2016, and it "is clear from the

underlying record that during that time period, Ace did not fund any employees' 401k plan, including Gibson's 401K." Gibson asserts that "there is no question it was a company obligation to fund the 401K plans," and that "there existed no judgment against Gibson mandating that he individually and personally was required to fund the company's 401K plan."

{¶ 36} Gibson asserts that "it is clear under Ohio Revised Code Section 2329.66 that money held in an individual retirement [plan] * * * cannot be attached by any debtor unless some of those portions of the 401K plan were deposited for purposes of evading payment for such things as child support or child health care coverage." He directs our attention to R.C. 2329.66(A)(10)(c), and he asserts that the funds he obtained through his disbursement of his 401(k) funds was clearly money paid by Ace into the 401(k) plans for several years up to and through February 2016. According to Gibson, "the 401K plan was a qualified plan and all of the money in that plan, in Gibson's name, was exempt from attachment." Gibson argues that it is clear under Ohio R.C. 2329.66 and Ohio, federal and state court decisions that the funds disbursed from his 401(k) plan were exempt from creditors, and the trial court therefore erred by disbursing these retirement funds to Stacy and Arvin. He directs our attention to *Daugherty v. Central Trust Co. of Northeastern Ohio, N.A.*, 28 Ohio St.3d 441, 504 N.E.2d 1100.

{¶ 37} Stacy responds that Gibson had twice been found in contempt by the trial court: in November 2016 for failing to carry out a redemption agreement pertaining to Ace, and in December 2016 for providing fraudulent testimony and offering fraudulent documents to the court regarding the settlement. Stacy asserts that Gibson solidified his control of Ace's financial affairs when he "unilaterally removed Stacy's checking authority

in July, 2016." Stacy and Arvin had 401(k) deductions taken from their paychecks after that time, but Gibson did not pay such funds into the 401(k) plan; rather, he kept the funds in Ace's account. Stacy argues that the protection afforded by R.C. 2329.66 "is not available to Gibson given the facts of record in this case."

{¶ 38} Stacy further asserts that to "the extent that some bankruptcy cases may hold differently, by statute such bankruptcy rules do not apply in Ohio courts," citing R.C. 2329.662; he argues that to qualify funds as exempt from execution under R.C. 2329.66, "the defendant must show that the funds are for retirement, support purposes." Stacy directs our attention to Exhibit A, attached to his motion to detain funds, as "the only facts in evidence as to the intended use" of the $10,000 at issue. Stacy argues that "Gibson agreed that such funds were for the potential satisfaction of a business-related debt, comparable to the pledging of IRA funds" in *In re Roberts*, 326 B.R. 424 (Bankr.S.D.Ohio 2004), which concluded that "any use of the IRA as a pledge of security serves to render it non-exempt." According to Stacy, we should follow *Roberts* here.

{¶ 39} Stacy further asserts:

Rather than taking the unsupportable position that [Gibson] has met his burden of proof, [Gibson] merely argues the simple fact of withdrawing IRA funds and depositing them into a checking account does not lose the benefit of the exemption. As evidence by the lower court's citation of authorities to the contrary in its decision, the law is, at best, split on this subject. This is, however, a question this Court need never reach in resolving this case.

It is hornbook law that an appellate court cannot reverse a lower

court's correct judgment even if erroneous reasons are assigned by the lower court therefor. * * *

As set forth above, given the undisputed facts in the record, [Gibson] designated the subject funds as being potentially allocable to the judgment of the lower court. Accordingly, all evidence in the record before this Court shows that the funds do not fall within the statutory exemption intended to protect retirement funds necessary for support. Accordingly, this Court must affirm the lower court's October 17, 2018 decision to use such funds to restore the retirement contributions of the Company's innocent employees.

{¶ 40} In reply, Gibson asserts that Stacy attempts to convince this Court that Gibson "somehow agreed" to set aside the $10,000 to pay Ace's "business related expenses," when if fact, it is "clear from the record" that Gibson, individually, never agreed to fund Arvin's and Stacy's 401(k) from his own 401(k) funds. He asserts that Ace "never funded" the plans of Arvin, Stacy or Gibson "for the pre-receivership deficiencies" from May through December 2016. "The fact of the matter is that Ace did not fund any employees' 401K plan during that time period."

{¶ 41} Gibson also argues that it "is uncontested by both parties to the underlying litigation" that the source of the $10,000 held in escrow was clearly traceable to Gibson's 401(k) funds. He argues that *Daugherty,* 28 Ohio St.3d 441, 504 N.E.2d 1100, is "directly on point" and "held that these funds do not lose their exempt status when withdrawn from a 401K plan and deposited into a personal checking account."

{¶ 42} R.C. 2329.66(A)(10) provides in relevant part as follows:

(A) Every person who is domiciled in this state may hold property exempt from execution, garnishment, attachment, or sale to satisfy a judgment or order, as follows:

\* \* \*

(10)(a)  \* \* \* the person's rights to or interests in a pension, benefit, annuity, retirement allowance, or accumulated contributions, the person's rights to or interests in a participant account in any deferred compensation program offered by the Ohio public employees deferred compensation board, a government unit, or a municipal corporation, or the person's other accrued or accruing rights or interests, as exempted by section 143.11, 145.56, 146.13, 148.09, 742.47, 3307,41, 3309.66, or 5505.22 of the Revised Code, and the person's rights to or interests in benefits from the Ohio public safety officers death benefit fund;

(b)  \* \* \* the person's rights to receive or interests in receiving a payment or other benefits under any pension, annuity, or similar plan or contract, not including a payment or benefit from a stock bonus or profit-sharing plan or a payment included in division (A)(6)(b) or (10)(a) of this section, on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the person and any of the person's dependents, except if all of the following apply:

(i) The plan or contract was established by or under the auspices of an insider[1] that employed the person at the time the person's rights or

---

[1] "Insider" is defined in R.C. 2329.66(C)(2).

interests under the plan or contract arose.

(ii)   The payment is on account of age or length of service.

(iii)   The plan or contract is not qualified under the "Internal Revenue Code of 1986," 100 Stat. 2085, 26 U.S.C. 1, as amended.

(c) * * * the person's rights or interests in the assets held in, or to directly or indirectly receive any payment or benefit under, any individual retirement account, individual retirement annuity, "Roth IRA," account opened pursuant to a program administered by a state under section 529 or 529A of the "Internal Revenue Code of 1986," 100 Stat. 2085, 26 U.S.C. 1, as amended, or education individual retirement account that provides payments or benefits by reason of illness, disability, death, retirement, or age or provides payments or benefits for purposes of education or qualified disability expenses, * * *.

{¶ 43}  "All exemption statutes are to be construed liberally in the debtor's favor. * * *.  The objecting party bears the burden of proving that an exemption is inappropriate under Ohio state law. * * *."  *In re Clark,* 2019 WL 1905178 (Bankr.N.D. Ohio 2019), * 2.

{¶ 44} We initially conclude that the trial court's conclusion that the funds at issue fall within R.C. 2329.66(A)(10)(a) is misplaced. That provision is "limited to accounts created for the benefit of public employees." *In re Yashura*, 2012 WL 847752 (Bankr.N.D.Ohio 2012), fn. 3; *In re Monro,* 282 B.R. 841 (Bankr.N.D.Ohio 2002). We note that a quote that the trial court attributed to *In re Bostic* is actually found in *In re Cobb,* 231 B.R. 236. *Cobb* discussed *Bostic*, 171 B.R. 270, noting that in *Bostic*, the Chapter 7 bankruptcy trustee sought to recover money that the debtor withdrew from an ERISA

qualified trust and did not roll over into another protected plan, but retained to pay a creditor. *Cobb* at *239. The *Cobb* court concluded that the debtor therein also "withdrew the funds in question not to roll them over into another protected fund, but to make payments to her creditors," and there "was no statutory support protecting the funds from the debtor's creditors once she withdrew the money from her protected plan and deposited it into her personal checking account." *Id.* While the trial court concluded that case law stands for the proposition that funds protected by R.C. 2329.66 are only protected while in those accounts, the cases cited by the court do not discuss R.C. 2329.66.

{¶ 45} We next conclude that Gibson's reliance upon R.C. 2329.66(A)(10)(c) is also misplaced. "Section 2329.66(A)(10)(c) 'specifically encompasses individual retirement accounts, including retirement annuities established by individuals.' *In re Malsch*, 400 B.R. 584, 589 (Bankr.N.D.Ohio 2008)." *Yashura* at *3. "By contrast, subparagraph (b) of § 2329.66(A)(10) addresses exemptions in pension benefits provided by private employers, such as benefits under a 401(k) plan." *Id.* The retirement plan at issue herein was a 401(k) account, not an individual retirement account, and R.C. 2329.66(A)(10)(c) did not apply to Gibson's claimed right to the funds.

{¶ 46} The court in *Monro* discussed the "significant differences between R.C. 2329.66(A)(10)(a) and (A)(10)(b), both of which exempt pensions and annuities, as follows:

> * * * In particular, paragraph (A)(10)(b), which makes absolutely no reference to public employee benefits, places additional limitations on a debtor's ability to exempt property as compared to paragraph (A)(10)(a).

For example, unlike paragraph (A)(10)(a), a debtor may only exempt a pension or annuity under (A)(10)(b) of § 2329.66 to the "extent reasonably necessary to support" the debtor or any of the debtor's dependents. Additionally, § 2329.66(A)(10)(b), unlike its counterpart under paragraph (A)(10)(a), only permits a pension or annuity to be exempted if it is received "on account of illness, disability, death, age, or length of service." Finally, and also in contrast to paragraph (A)(10)(a), a pension or annuity is not exempt under paragraph (A)(10)(b) of § 2329.66 if the three part test set forth in subparagraphs (i)-(iii) is satisfied.

{¶ 47} While *Daugherty*, 28 Ohio St.3d 441, 504 N.E.2d 1100, upon which Gibson relies, held that "statutorily exempt funds do not lose their exempt status when deposited in a personal checking account," the funds at issue must first meet the definition of statutorily exempt. To be exempt under R.C. 2329.66(A)(10)(b), the 401(k) funds must have been "reasonably necessary to support" Gibson or his dependents and received "on account of illness, disability, death, age or length of service." We conclude that the funds in Oxley's trust account were not statutorily exempt. Gibson did not receive and deposit the funds into his personal account, but rather when the funds in his 401(k) plan were distributed, a separate check was signed over to the receiver with instructions that the money go not to Gibson directly but to Oxley's trust account, over which Gibson had no control. In other words, the funds were not protected by R.C. 2329.66.

{¶ 48} In his motion to detain funds, Stacy asserted that Gibson misappropriated money that "that should have gone into persons' 401(k) accounts." Gibson testified that, while he had sole control over Ace's finances and payroll, money was withheld from

employees' paychecks for 401(k) purposes and not remitted to the 401(k) plan administrator. "The elements that must be proven in a claim for unjust enrichment are '(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment.' * * *." *Wright v. City of Dayton*, 158 Ohio App.3d 152, 2004-Ohio-3770, 814 N.E.2d 514, ¶ 41. The benefit conferred upon Gibson was the funds he knowingly retained from Stacy's and Arvin's payroll deductions in the amounts established by Cowan's testimony and exhibits. Since Stacy established that Gibson's 401(k) funds were not exempt and that Gibson was unjustly enriched by the payroll deductions, Gibson's assigned error is overruled.

{¶ 49} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and HALL, J., concur.

Copies sent to:

Richard L. Carr, Jr.
Scott G. Oxley
Christopher Cowan
Bradley Smith
John Rieser
Ace Sprinkler, Inc.
Hon. Mary L. Wiseman